Case on today's docket, this case of Amy Ciborowski. I'm not going to correct you just yet. You are, but maybe you made it look like it. You did quite right. As Administrator of the State, Kevin, this is v. Wedekemper's, Inc. and the Ritchie Brothers auctioneers, and v. third party complaint against American Asphalt and Grain Company and Wedekemper's Construction, Inc. And we have Mr. Kurt Reeves for the appellant, and we have Mr. Gary Meadows for the appellee. And you may proceed, Mr. Reeves. May it please the Court. I'm Kurt Rice, and I represent Ritchie Brothers auctioneers. This appeal arises out of the death of Kevin Ciborowski. And on September 21, 2011, Kevin Ciborowski and other employees of Wedekemper's Construction were building a metal tower for a grain handling storage. And to do so, Wedekemper's Construction, Kevin's employer, borrowed a boom truck from a sister company, Wedekemper's, Inc. This boom truck that was involved was a 2005 Ford F650XL, a big truck. It had a mounted boom and crane assembly on it. It had been purchased two years earlier used in Nevada and had not been inspected or maintained pursuant to OSHA since that point. While using this boom truck, while this construction was taking place, as the appellee's brief so accurately puts it, the boom and crane failed, causing the tower to fall, killing Mr. Ciborowski. And as you might expect, Kevin Ciborowski's estate sued the owner of the boom truck, which failed, Wedekemper's, Inc. They also sued my client, Ritchie Brothers auctioneers. And the basis for that claim was that almost two years before this incident on November 21, 2009, Ritchie Brothers, Inc. had sold this boom truck, Wedekemper's, at auction. And in fact, Ritchie Brothers was sued for selling this piece of used equipment, which was already four years old, which was 2005, already had 80,000 miles on it. Was sued for suing this used piece of equipment, was sued for selling it as is, where it is, with no warranties. And was sued, despite language in the sales documents, which required Wedekemper's, the purchaser, to repair at its cost to a safe operating condition without limitation to a condition which meets any standard or requirement or any applicable authority, law, or regulation, including those concerning any use, and that's going to be important here in a minute, any use to which the truck may be put. Ritchie Brothers filed a motion to dismiss the client's complaint, pointing out all of this, pointing out the well-settled law, both in Nevada and Illinois, that the seller of used equipment is not responsible in negligence or strict liability when it's sold as is. They lost, so they're stuck in the suit. I'm standing because I have back surgery. I'm sorry. Don't let that bother you. No, there was a settlement. Yes, yes. So they're stuck in the suit, and so what we did, Your Honor, Ritchie Brothers filed a contribution claim and a contractual indemnity claim against Wedekemper's, Inc., and then, as so often happens in catastrophic personal injury cases and death cases, a culpable defendant settles out, and that's exactly what occurred here, and leaves the other defendant exposed. So, but here there's a contractual indemnity claim, and as the Court well knows, a contractual indemnity claim is not established under the Contribution Act, and that still has to be dealt with. Well, the Court, without explanation, dismissed the contractual indemnity claim and allowed Wedekemper to walk away from the suit, and that's what this appeal concerns, whether that claim for contractual indemnity should have been dismissed at the initial pleading level, on a 619 motion at the initial pleading level, or whether we should have had a chance to pursue our claim. And as this Court knows better than I, a section 2-619 motion is a drastic remedy, even more drastic than a motion for summary judgment. It accepts all facts alleged as true. It also requires the Court to interpret all pleadings and supporting documents in the light most favorable to the non-belief party, that's my client, and it also requires a complete and no review on appeal. And, Your Honor, what I'm going to repeat now are the facts set out in our contract, which have to be deemed true in the context of dealing with this motion to dismiss. The sale of this equipment, the sale by Ritchie Brothers of this used truck, occurred almost two years before Kevin Zborowski's death in Nevada, half a continent away. It is also deemed true that this Ford truck had been sold in used condition and was already over four years old. It was also deemed true, as set out in our contract claim, that it was sold as-is, whereas, with no other warranties. It was also deemed true, and maybe most significantly, that the sales documents required Weed and Temper to repair this Ford truck, this Ford boom truck, at its cost to a safe operating condition and without limitation to a condition which met any standard or requirement or any applicable authority, law, or regulation including any use to which the truck must be put. And, as we'll find out, it was this use, really misuse, which ended up in Kevin Zborowski's death. It's also deemed true that the sales agreements, the bidder's registration agreement, the listing catalog, and the invoice incorporated a contractual indemnity provision to give Ritchie Brothers some ability to exercise control over the obligations Weed and Temper had promised in these contracts. When they promised that they're going to bring this truck and put it in a safe operating condition and maintain it for any use, there's an indemnity clause protected on it. And so, ultimately, that is the indemnity language which must be interpreted, and it must be interpreted not just on its own, like, Well, I don't know if this is going to help at all. This is a debriefing. This is the indemnity language. It's not just this indemnity language. It's all the exhibits to the contract, which include all the documents I went through, which include an obligation from this company to maintain and repair this up to standard or requirement for any use to which it has, which is what caused Kevin Zborowski's death. So here's the language. Okay. A lot has been made about the comments. Yes. Yes. The other side, and we'll have a stand, but we've had a lot of issues about the comments. So we start off with this. We start off with his bid. That's Weed and Temper. And you can go through the whole thing with our actions, personal involvement, a lot of stuff. That's Weed and Temper. Agrees to indemnify St. Marble's auctioneers, that's us, its designers, et cetera, from any and all actions, causes of actions, suits, damages, costs, and losses of any nature arising from the purchase or use of any items. Then it goes on to say, or, and this is where it's, of course, already anticipated. We get into arguing about placement of accounts. But it says, or, or the attendance or participation of the bidder's agents or employees at the auction sale. And it goes on. So what we're talking about here, well, Weed and Temper has to say, in order to avoid responsibility under this indemnity clause, to say, well, this only is about the auction.  What happens at the auction. That's correct. It's only about the auction sale or the auction site. It's not about anything else. And in order to do that, they have to do several things. First, first we don't know what the trial court will. Because the trial court never said, never expressed any kind of opinion, just granted the motion to dismiss. Next, you cannot, when you, when you look at this clause in the context of everything else that's been signed, all the other documents that were all attached to this exhibit to the counterpoint, it is clear that what we're talking about is indemnity for the purchase of the equipment, indemnity for the use of the equipment, and indemnity for the attendance and participation of the bidder at the sale. So basically they sell used equipment, correct? Yes. They don't sell new. You know, I honestly do not know if they sell new equipment. My understanding is they're one, if not the URs, one of the largest auctioneers in the country. And they sell either on consignment or they buy it themselves and sell it here. They actually sold used equipment themselves where they sell used equipment. That's my general understanding. This is the company that's out on 255 here in Kingsville. Yes, exactly. This was sold in Nevada. I changed the tire in their parking lot about three weeks ago when I had a flat tire on 64. They've got some large equipment. Yes. Yeah, I mean it just rolls through on the roadway. Rolls and drains. Yeah. That's it. So anyway, when you consider this in the context of the word used, and you go to those provisions which are in our brief at page 4, which talk about use in the future, that your use has to conform to all the requirements of law, has to be brought up to the proper conditions, that's what used means. And when you go through this, I would suggest to you a fairly plain reading of this is that they're trying to cover their bases on everything. They're trying to cover anything arising from the purchase of the equipment. They're trying to cover anything that arises from the use of the equipment. And what's more, if you're just window shopping, you didn't buy anything that day, anything from your attendance or participation at the sale. You get run over by a big piece of equipment. If you come on our property and want to be a bidder, you sign off on this bidder agreement, and we're trying to cover the boardroom. And we are certainly looking forward. There's absolutely no question from the documents. We are surely looking forward for having them comply with bringing their equipment up to code, up to requirements, which, again, is the exact thing that caused this incident. So that is our argument in a nutshell. And I guess what's more, if all the obligations under the opposition's interpretation of this, if all of the obligations ended at the time of sale, how could we possibly reconcile that with Term 7 of the bidding and sale agreement, which says, Bidder further agrees to repair at his cost any lot purchased at the auction to a safe operating condition and without limitation to a condition which meets any standard or requirement of any applicable authority law or regulation, including those concerning any use to which this lot may be put. That's fixed. Before you go out and use it, make sure it's safe. This is heavy equipment. Make sure it's safe. Make sure it meets the applicable law and fix it. Inspect it. Maintain it. Take care of it, which is the exact reason why we're here and why Mr. Zborowski got killed. So... Has that really been the... Has there been a finding that that's the reason he got killed, is that the equipment was defective? Well, to answer your question, there has not been... Both defendants settled, so there's been no finding by a jury on it. For whatever reason, the appellee says the equipment failed. What, the boom failed or something? As I understand it, a number of things happened. There was a safety guard that was not present that allowed the cable to move off of a pulley, and it went from there. And ultimately, the tower fell. It wasn't the crane that killed Mr. Zborowski. The tower, I think, believe actually fell over and struck him. But there's... I'm trying to find out if the circumstances actually fall within the indemnity clause. Okay. You say it has to be brought up to code and all of that, but if that, the failure to do so didn't cause death... Well, those are... We sure would like to pursue that, Judge. We sure would not want to be poured out on a motion to dismiss. I'm sorry? I said we sure would like to pursue that very question you're asking. We don't want to be poured out on a motion to dismiss before we ever get to that point. And the complaint that we incorporated into our counterclaim pledged those very things that this crane was defective. And we incorporated that into it, and we pledged those very things. And we sure would like the ability to pursue this claim and find out and not be poured out on a motion to dismiss when all those facts are deemed true on a motion to dismiss. And that's our point. And you can agree or disagree with this statement. The Ritchey brothers should have never been in the suit of the first place. The seller of used goods is not liable under Illinois or Nevada law. The auctioneer is not liable under when they sell as is whereas. We're in it. I understand that's not part of this appeal. But so Ritchey brothers, what do they have to do? They've got to cover themselves. They've got to cover themselves for this exact scenario, and that's what they did. They went out and got an identity agreement that says if we get drugged into court on one of these where we sold a piece of equipment and we told you it's your responsibility to fix it, we want an identity. Where it arises out of the use of your equipment and then the exact phrase use of the equipment is in the sale documents, we covered ourselves. So there's no question that it arose out of the use of the equipment. I don't think so, Your Honor. I don't think so. I mean, the man who was killed was using the equipment when whatever happened. I believe it was on the ground. But it's the equipment that caused the accident. So we covered ourselves. Finally, there's been some claim that this agreement is no good because it doesn't cover our own name. And I would respectfully suggest we're not even there yet. We want to get passed a motion to dismiss. And I would candidly say to the court I like my chances of arguing to a judge about this contract as to whether we're at fault when we have a contract that says it's sold as is, where is. When we have a piece of equipment we sold used with 8,000 miles on it that was already five years old. When we tell them specifically in the contractual division that you are the ones who need to bring this up and make it safe. I like my chances as to whether or not I'm going to be found negligent. Mr. Wright, this is sort of side, but what is as, where is. As is, where is. I don't know what as is, but what is where is. Does it mean the same thing? I think it's more same. I think it's often it's disclaimer verbiage. I thought it was you had to pick it up there. Thank you. Okay. It's as is. So it's as is, as it is, where it is. And where it is. Okay. You've got to get it. This is an as is situation. Yes. Yes. So I guess I'll close by I would respectfully suggest we were entitled to make this claim when we made it. We're entitled to pursue this claim. We're entitled, I believe, to get past the initial pleading stage and to argue to the judge all the things that I've just talked about, all of which are in our papers, are attached to the counterclaim, and have to be deemed true for purposes of ruling on a motion to dismiss. And unfortunately, in these scenarios where multi-party defendants exist, this contractual indemnity claim never should have been dismissed. These two defendants should have been allowed to fight it out and have the court look at the documents and make a determination. And I frankly don't see how this ever got ruled on on a motion to dismiss in this fashion. Well, at the trial court level, didn't you get the opportunity to argue what you just argued to us today, that there was another contractual provision that says that they've got the responsibility of repairing it or making sure it's safe? Yes. And we got a one-line order that said, motion to dismiss granted. And we filed a motion to reconsider because it did not even indicate what state law applied. And we got another one-line order that said, motion to reconsider did not, which is why we're here. So, yes, we made all these arguments. Is there any questions? No, I think you'll have the opportunity for rebuttal. Mr. Meadows. Good afternoon. Good afternoon. Did you know it's snowing out there? Pardon me? It was snowing out there a little earlier. Well, it is snowing right now. Are you kidding me? No, I'm not. A little bit too early. Your Honors, may I please the court? Counsel. I represent Weed Campers Inc. in this case. Weed Campers Inc., just to educate the court a little bit, is a family company out of Clinton County that basically sells farm equipment like grain bins and maybe some conveyor things. And to the extent they're asked, they will help construct some of what is built in southern Illinois in some of the counties outlying Clinton County. Now, obviously you've heard a fair number of facts. And let me just go back over some of the things that the plaintiffs were chasing when this case began. They sued both Weed Campers Inc. for, I believe it was negligence, willful and wanton, and warranty. So I think a warranty claim. They also sued Ritchie Brothers for negligence and for strict liability. Now, was the plaintiff an employee of one of the Weed Camper entities? The father, Gary Weed Camper, owns Weed Camper Inc. One of his sons has a separate business called Weed Campers Construction. The father of Weed Camper Inc. sometimes subcontracts out the labor. And so when he does that, he will hire his son's company. And so the decedent was working for Gary Weed Camper's son's company at the time. And that's when Mr. Wright indicated that the son's company had borrowed the truck belonging to Weed Camper Inc. that was purchased by Gary Weed Camper. So in any case, we have a lawsuit. And just to basically give you a background, what actually happened back in the day, and this was developed not only while I was in the case, while Weed Camper Inc. was in the case, but also after we were dismissed out and Ritchie Brothers continued to fight with the plaintiff over the case, is that basically it all developed that when Weed Camper Inc. purchased this at this auction, actually let me back up a second, Ritchie Brothers purchased a lot of equipment, and when I say a lot, I mean a lot of 19 pieces of equipment from another company. They bought them themselves, not as a normal auctioneer, but as somebody buying and selling and seeing what profit margin there is. And they apparently inspected the – Wait, I didn't understand that. I'm sorry. They purchased, I believe, 19 pieces of equipment, including this truck. They inspected apparently 17 of them. But you said they purchased it as a lot different than – No, they purchased a lot of 19 pieces. They normally – I mean, I think – and I don't know if this is in the record, but I think normally their business is 75 to 80 percent acting as an auctioneer. Okay. They're running other people's equipment. Right. But in this particular situation, they actually purchased the equipment and then put it on the market for themselves and then took the profit from the sale. And basically what – Does that make a difference legally with respect to – I think it might. I think it might because the Illinois law basically talks about auctioneers never hold title, never hold possession, have no real accountability to the product. But if you're selling it, if you're selling a product, clearly you have some obligation relative to what you're selling. And they were the owner of record when they sold it. It was used and then used for, what, a couple more years at the time that – Correct, correct, correct. That the accident happened. So what ends up happening is this truck is sitting out there and it's been purchased by Ritchie Brothers. There are things called wire retainers, and I don't know if that's the exact term, but basically it prevents the cable from coming off of the boom. And the testimony was that apparently it was later determined that the wire retainers had never been on the boom. And so when my client owned it, basically he didn't use it much because he basically used it as a tool to store his tools essentially. But basically what he – but what was determined was that when they bought it from Ritchie Brothers, apparently it didn't have that safety guard on it as it was. My client didn't know at the time that you actually had to inspect those little trucks with little cranes. He understood that the big cranes, you had to have inspections. He didn't know it for the little ones. And so basically it wasn't used very much, and then unfortunately about a year after it was put into use, after it was used a few times, we had this accident. So this idea that Ritchie Brothers has no responsibility, no fault, no nothing because all they did was wash their hands of it really doesn't apply. It applies in one way. It applies as it relates to we decampers because we didn't sue Ritchie Brothers. We didn't sue them for breach of warranty. We didn't sue them for any of that stuff. The person that sued them was the Sedan's family who basically said – But isn't that why they have an indemnity agreement is that they're selling used equipment? Correct. No, I understand, and that's what I think they were trying to accomplish. My point is I'm going to say basically they didn't actually do it properly. So – and let me just run right into that. Because it became apparent that obviously there was a problem for we decampers because we – my client, I think he's been seated at his deposition. He shouldn't have had an inspector. He didn't realize he was required to. And so when the Plains Council suggested a settlement, it was settled and settled fairly – I shouldn't say easily. It was settled fairly expeditiously. At that time, Ritchie Brothers filed their claim against us for contribution and for indemnity. The contribution claim was for a failure to repair. Of course, that went with our settlement, and we're talking about all this post-sale obligations. The duty to repair or the failure to repair after we received it was contemplated by the contribution claim in Judge Lopino because the settlement dismissed the contribution claim. But then the contractual indemnity claim went forward, and we started litigating that issue. Now, do you mind if I use your word a moment there? Here. Contractual indemnity. As this – as the court basically commented, we made several arguments to the court, and I'll just touch on one of them. We argued initially that the – that initial argument that the indemnity appeared to only relate to things occurring at the sale or on the site. And the reason we reached that conclusion is that there's a couple of commas in here, and I know that's sort of funny to be arguing. I don't fancy myself a grammarian. But they added a couple of commas, loss-of-any-nature comma, and comma after employees, which seems to make – which basically then had the effect of causing the last part of the phrase modify the first part. And I'm sorry. This is not – so basically we made the argument that, look, as written, it requires indemnity for things that occur at the site or on the sale or during the sale. Now, my client was asked about that in his deposition, what he thought that meant, and he said, I thought they were – that they were basically telling me that they were responsible for anything that occurred out here because it's at their site. That's what you'd expect your client to say. Well, but there were signs – apparently there were signs all over the place that said we're not responsible for anything during the sale, and so it sort of, for him, worked in – worked together. So anyway, we made that argument to Judge Lopino, but the couple other arguments that I think were more – actually as important, if not more important, we basically said that if they wanted to write the indemnity agreement, throw in this extraneous compass that changes the meaning of it, then in our mind, we think it, one, shows that there's no indemnity, but two, it's at minimum ambiguous, which means that – and as counsel – and as the court is aware, the case law is very clear both in Illinois and Nevada, and Nevada is the law that governs this case, at least as it relates to disagreement, is that they are to be strictly construed against the drafter. Did you have a grammarian explain this to the court? I wish I could. Well, I mean, I could read it and think that it would be ridiculous for, one, not to consider that they were really concerned primarily about causes of action, suits, damage, costs, and losses of any nature arising from the purchase or use of the item. Right. Or the attendance or participation of a bidder at the auction sale or on the auction site. I mean, to me, it would be pretty strange for a company that only sells used equipment to be more concerned about somebody getting hurt at the auction site rather than somebody taking a faulty piece of equipment off the site and getting hurt two years later. And I don't disagree. My point to Judge Lopino was I think they knew what they were trying to do. They just didn't do it. But what my question to you was, why is it that you don't think they were able to accomplish it with the comments they used? Because basically when they put this comment after nature and this comment before employees, they're basically making this – But, well, you've got a disjunctive or there. Right. And a comment before that. I think this is called a nested clause. I'm sorry. Did you have a grammarian give an opinion on that? Because I had a grammarian kind of read it to me and may not have come up with the same. No, and basically the argument from Judge Lopino was that I think we know what they were trying to do. We just don't think they did it. And at a minimum, it's unclear what it means, even if you think that their argument is potentially out there. And therefore, it has to be strictly construed against them as the drafter, as the indemnity. Now – Let me ask you this, counsel. You agree you have this duty to repair at your cost any lot purchased at the auction to a safe operating condition and without limitation to a condition which meets any standard requirement of any applicable authority, law, or regulation. Yes. And that's contained in the – It's part of the bidder's agreement. The bidder's agreement. Yes. And the indemnification clause is in the bidder's registration agreement. How does Ritchie Brothers enforce that requirement upon you to repair unless there's the indemnification agreement? By suing us for contribution. They sued us for contribution basically trying to pass along everything. And when we settled, that was no longer in play. But then you get to control their claim by settling. That's true. That's true. So the whole idea of the indemnity clause is for them to control the claim, not the person they're suing to control the claim. And that's true. And that's one of the reasons that, you know, as this case developed in the initial stages, clearly when the settlement opportunity arose – Right. That's why you – that's why indemnity – I think they filed a motion for summary judgment declaring they didn't have any fault or whatever, and I think Judge Lovino denied that, and so they chose to settle it in lieu of looking for a finding on whether they would be responsible to the plaintiff. And so – So Ritchie Brothers has settled out. Yes. The plaintiff is now – the plaintiff is now no longer has an interest in this case. It's strictly Ritchie Brothers trying to get whatever payment settlement – we don't know what that is – back to Weedy Kemper Zinc in some way. So, you know, it's about – Everybody's – we're also wondering how much we're talking about here, and we won't know. Well, I don't know if it's confidential, and maybe it was, but it was seven figures. It was substantially seven figures, and I'm assuming based upon the conduct of plaintiff's counsel, Ritchie Brothers was likely in the same ballpark, but we don't know. And so, I mean, it's a substantial amount of money, and one, that if Weedy Kemper Zinc suddenly had to pay several million or some million dollars, they would just be gone. I mean, this is a small business, so to speak, and they just wouldn't be gone. That's the reality of it. So when we were arguing in front of Judge Lovino, we basically said, look, I don't think the language says that. If you think that there's any argument it does, what they're saying, that it's strictly construed against them because, frankly, we don't think it does say it, and they drafted it. And the cases they cite to suggest somehow it's for the jury to determine the intent are not indefinite cases where strict construction is not a rule. But then lastly, and this may be the most meaningful point, under Nevada law, under Illinois law, under the old days, before 2008, to be indemnified for your own faults, your own negligence, so to speak, you had to clearly and explicitly say that in specific words. I think in 2008, the Supreme Court of Illinois made room for the possibility that the words any and all may take care of that. If we say any and all liability, that may be enough to subsume the idea of negligence or fault. Nevada, in 2010, for the first time, the Supreme Court adopted the majority rule, which was Illinois's old rule, that any and all would not work. And that's the language that's in here, is any and all. They're any and all. And so the point is that we – the final argument we make, that even if it says exactly what they say it says, it's not enforceable under Nevada law because they're seeking to be indemnified for their own conduct in selling a piece of equipment that was lacking a safety guard. They, in fact, I think later developed that they said that it was – at the auction they announced that it was rigged up right and ready to roll. And whether that's hyperbole, I don't know. But the point is that there is – this isn't a situation where somehow it's completely unfair to hold Ritchie Brothers Accountable for selling the products that it buys to others. And so basically, with Judge Lopa now, we said, look, even if you get past all this other – all these other arguments, the fact is we don't believe it's enforceable as it is. And because under Nevada public policy, the Supreme Court has said you've got to have the clear and express language, and it doesn't contain that. So basically – and I appreciate that you're – this court's attention to this matter is a serious matter for we to get, which I think it truly is. And we would simply ask that Judge Lopa's order be affirmed so that this case can be put to rest because, frankly, the plaintiffs at this point don't have a dog in the fight. They've received whatever – whatever they're going to receive from the parties. And it's just between Ritchie Brothers and Weedekippers. Thank you. Thank you, Mr. Meadows. Rebuttal, Mr. Rice? What about the any and all language in the law in Nevada? I think that under any and all, we've had cases in Illinois that said that's certainly enough. Under the Nevada law, it's what I said at the end of my argument. We're not there yet. I sure would like my opportunity to argue to the court that we weren't negligent, and I don't even need to identify against my own negligence. I sure would like the opportunity to present evidence that we sold it as is, where it is, that we sold it, a truck with 8,000 miles on it, four years old, and that we had the people specifically – this is talk of a small company. They went out to Nevada and bought heavy equipment. This is not a family farm. But in any event, I sure would like my opportunity to go out and show that these people signed a document where they promised that they would fix this equipment up and get it to code and make it safe and then didn't do it. And I'd like the court to decide whether under this identity clause I get my money back that I had paid when I got left holding the bag after they settled and got out of town. So – and we've heard a lot of facts, a lot of facts. What happens in a motion to dismiss under 619 when there's diffused due to facts? You don't grant the motion. You go on to the next thing, and we'll have the court ultimately resolve it on a trial. We've heard claims of ambiguities. What happens with ambiguities? Under a case directly on point, it says it is well established that if a contract is ambiguous, it presents a question of fact and cannot be decided on a motion to dismiss. This is Hubbard Street loss versus Inland Bank First District case cited in our paper. This never should have been decided on a motion to dismiss. Do you both agree that Nevada law applies here? I think, Your Honor, a fair reading of this indicates from the contract that Nevada law applies. And it applies to both the procedural law and the substantive law. I believe it applies to the substantive law, to answer your question, and it would still be Illinois procedure if I understand what you're asking correctly. Why Illinois procedure? Like, for example, discovery. We – I guess I would like to ask the trial court that. We repeatedly asked so we could brief it, and we ended up briefing it both ways because we could never get any indication from the court. But I think either way, the law is not substantially different. Illinois versus Nevada. Either way, either way would win. Well, according to Wiedecampers, it is. It's significantly different on the any and all. On that part, Illinois has very good cases for us where the same language as any and all means you can identify additional negatives. I know, but that's Illinois. I understood. In Nevada, it is more restrictive. That's my whole point is I don't have the ability to argue that and try to prove it to the court. I don't need to be identified for my own negligence. I just want them to pay for their own negligence that has been dumped on me. Why isn't that sufficient if Nevada has a much narrower reading to grant the motion to dismiss? Because, again, we were sued in strict liability. And I don't believe if we're given the opportunity to litigate this, we're going to be found in strict liability. I don't believe we did anything wrong. I think we sold it as is, where is, did all the proper things. And I want somebody to decide whether we're at fault. And I understand your argument, but if it's true that Nevada law is much more restrictive on your indemnity clause, then it seems to me that potentially that document gets you in trouble before you ever get to ask those questions. Again, we're not asking for indemnity for our own negligence. We're asking for indemnity for what they did, for their use in not bringing it up to court. That's what we're asking for indemnity. We're not asking for our own negligence right now. We're asking for the exact thing that caused this accident, according to the plaintiff's complaint, which is they got sold a piece of equipment, they didn't fix it up to code, there were any other problems with it, they didn't inspect it, there was OSHA requirements, everything else. And what happened? Somebody got killed from their abuse. I'm not asking for indemnity for my own negligence. And it's kind of a trick bag to suggest that we're not. We are simply not. Now, this or, and I can't even pretend to get into the nits of this, but or means destructive to me. And when we get to purchase or use or attendance at the auction, I mean, it's pretty simple. And, again, if there's any question about it, now we're talking about a disputed factor, and I sure would like my chance to convince somebody to get past the initial motion. So the whole point of this is they bought their piece, as the court pointed out. And under the contribution act, they're excused. But they didn't buy my piece. And they're responsible for my piece under this provision. And that's the whole point of that contractual indemnity clause. Thank you, Mr. Wright. Thank you, Mr. Meadows. We'll take the matter under advisement.